UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

WILLIAM D. QUICK, JR.,

                        Plaintiff,

v.                                                                    Case No.  5:09-cv-111-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                        Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions. (Docs. 13 & 14.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

In August 2005, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging a disability onset date of July 26, 2003. (R. 72-74.) Plaintiff's application was denied initially and upon reconsideration. (R. 25, 35-36, 59-61, 64-65.) Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 57.) The ALJ conducted Plaintiff's administrative hearing on September 12, 2007. (R. 270-94.) The ALJ issued a decision unfavorable to Plaintiff on October 1, 2007. (R. 11-22.) Plaintiff's request for review of the hearing decision by the Social Security

Administration's Office of Hearings and Appeals was denied. (R. 3-5, 8.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law

defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment that can be expected to result in

death, or has lasted or can be expected to last for a continuous period of not less than

twelve months.[6] The impairment must be severe, making Plaintiff unable to do his

previous work, or any other substantial gainful activity which exists in the national

economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a

claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a

claimant does not have any impairment or combination of impairments which

significantly limit his physical or mental ability to do basic work activities, then he does

not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments

meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the

Code of Federal Regulations, he is disabled.[11] Fourth, if a claimant's impairments do not

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was forty nine (49) years old at the time of the ALJ's decision on October 1, 2007. (R. 11-22, 72.) He has a high school education with some college credits, and has previous work experience as a chef and a culinary arts instructor. (R. 77-80, 274.) Plaintiff contends that he has been unable to work since July 26, 2003 due to lumbar disc disease, torn cartilage in his left knee, carpal tunnel syndrome, rotator cuff injury in his right shoulder and bone spurs in his ankles. (R. 36, 72.) Plaintiff is insured for benefits through December 31, 2004. (R. 66.)

---

[17](...continued)
grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[19] Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[20] See id.

[21] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, and testimony from a vocational expert ("VE"), the ALJ determined that Plaintiff suffers from a back disorder, and a left knee disorder. (R. 16.) While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. Specifically, the ALJ found that the objective medical evidence fails to establish that Plaintiff met the criteria of Section 1.00 of the Listings of Impairments. (R. 18.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of sedentary work. (R. 18.) The ALJ further limited Plaintiff to walking with a cane and occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, and/or scaffolds. After finding that Plaintiff could not perform his past relevant work as a chef or vocational trainer, the ALJ consulted a vocational expert ("VE"). Based on the VE's testimony, the ALJ found that Plaintiff was capable of performing work which exists in significant numbers in the national economy and, therefore, was not disabled. (R. 20-21.)

**Medical Evidence**

Plaintiff has a long history of multiple orthopedic complaints with the most prominent among them being his lumbar spine problems. Plaintiff's back problems reportedly began in 1987 after he was injured while working as a police officer in New York. Plaintiff subsequently had two surgeries on his lumbar spine in an effort to resolve

his lower back pain. (R. 110.) In December 1994, Plaintiff experienced an exacerbation of his low back pain and underwent surgical intervention for a third time to address a ruptured disc at L4-L5. (R. 97.) At that time, Plaintiff advised that he had been experiencing back pain "off and on" since the onset of his back problems in 1987, but that the pain started getting worse a couple of months prior. (R. 110.)

In early 2001, Plaintiff initiated treatment with Dr. Allam Reheem, a pain management specialist. (R. 121.) After diagnosing Plaintiff with chronic persistent lower back pain, failed back surgery syndrome, and facet arthropathy, Dr. Reheem performed epidural injections in Plaintiff's lumbar spine in February 2001 and again in March 2001. (R. 115, 121.) The medical evidence of record reflects that Plaintiff thereafter returned to Dr. Reheem for additional treatment in August 2002. (R. 181.) By November 2002, Plaintiff reported that his pain medications (as prescribed by Dr. Reheem) were controlling his pain to a tolerable level. (R. 180.) Between February 2003 and January 2004, Plaintiff returned for five more visits and consistently reported that he was "doing well" with his pain medications and they were helping control his pain . (R. 175-79.) In August 2003, Dr. Reheem noted that Plaintiff was able to get in the pool and exercise on a daily basis. (R. 177.) In April 2004, Dr. Reheem noted Plaintiff's new complaints of having "a lot of left knee pain" and also that his low back pain had increased "over the last several days." (R. 174.) Plaintiff returned with continued complaints of back and knee pain in June 2004. Despite Plaintiff's complaints of pain and request for an adjustment in his pain medications, Dr. Reheem maintained him on the same pain regimen. (R. 173.) Dr. Reheem re-evaluated Plaintiff four weeks later and noted that

Plaintiff "seem[ed] to be improving fairly well" following the July arthroscopy of his knee. Pursuant to Plaintiff's complaints of increased back pain, Dr. Reheem adjusted Plaintiff's medication by increasing the doseage of the Duragesic patches. (R. 172.) Nonetheless, Plaintiff never filled his prescription for the Duragesic patches and, during his office visit with Dr. Reheem in December 2004, asked for a refill of his methadone prescription only. Accordingly, Dr. Reheem discharged the Duragesic patches. (R. 171.) In addition, it was not until March 2005 that Dr. Reheem mentioned any functional limitations associated with Plaintiff's subjective complaints of back pain. (R. 170.) Two months later, Dr. Reheem noted that Plaintiff's condition had stabilized and that he was functional. (R. 168.) Apparently, Dr. Reheem never treated Plaintiff for any complaints of shoulder pain.

The medical evidence reveals that Plaintiff saw Dr. Walter Choung, an orthopedic specialist, for treatment of various orthopedic complaints between August 2001 and July 2007. In August 2001, Dr. Choung performed carpal tunnel release surgery on Plaintiff's right arm. (R. 146.) As part of the pre-surgery work up, Dr. Choung incidentally noted that Plaintiff had undergone surgery of his right shoulder approximately two years prior. (R. 149.) There are no additional medical records from Dr. Choung until March 2002 when Plaintiff presented with complaints of pain in his lumbar spine, intermittent discomfort in his left ankle, and his primary complaint—persistent discomfort in both hands with periodic numbness. Dr. Choung's examination focused on Plaintiff's upper extremities and Dr. Choung noted that Plaintiff was "experiencing difficulty grasping objects." (R. 195.)

In January 2003, Plaintiff complained of triggering of fingers in his right hand and discomfort in his left shoulder which radiated down his left arm. (R. 193.) In August 2003, Plaintiff reportedly returned with a "new" complaint of pain in his right elbow and forearm which, according to Dr. Choung's treatment note, caused Plaintiff to have difficulty grasping objects. Dr. Choung's examination and treatment focused on Plaintiff's right elbow. An x-ray of Plaintiff's right elbow was unremarkable. Dr. Choung gave Plaintiff an injection in his right elbow and instructed him to return for evaluation in two weeks. (R. 192.) When Plaintiff returned two weeks later, his primary complaint once again concerned persistent pain in his right elbow and forearm. (R. 191.) Dr. Choung saw Plaintiff later that same month for follow up treatment of his right elbow and forearm pain and noted that Plaintiff was contemplating surgical intervention for this problem. (R. 190.) In September 2003, Plaintiff returned for a follow up visit and Dr. Choung observed "very little change" in Plaintiff's right elbow and forearm symptoms since Plaintiff's prior visit. (R. 189.) In October 2003, Plaintiff advised that in addition to his right elbow and forearm pain he was now experiencing triggering of the middle and ring fingers of his right hand. Dr. Choung recommended surgery. (R. 188.)

In April 2004, Plaintiff presented with complaints of left knee pain of a non-traumatic origin that began approximately two weeks prior. Dr. Choung's examination focused on Plaintiff's left knee and revealed effusion, decreased range of motion, tenderness to palpation and positive clinical findings indicative of torn knee cartilage. (R. 209.) An x-ray of Plaintiff's left knee revealed mild narrowing of the medial joint space. Dr. Choung gave Plaintiff an injection in his left knee and instructed him to return later

that week for additional treatment. (R. 209.) Later that week, Dr. Choung noted "significant improvement" in Plaintiff's left knee symptoms. (R. 208.) Plaintiff returned in May 2004 for a follow up visit concerning his complaints of left knee discomfort. Once again, Dr. Choung noted Plaintiff had made improvement since his last office visit. Nonetheless, Dr. Choung instructed Plaintiff to limit twisting motion and encouraged him to strengthen his quadricep muscles. (R. 207.) Later that month, Plaintiff returned for a follow up visit and Dr. Choung noted his primary complaint was persistent pain in his left knee and that his pain was associated with weight-bearing activities. (R. 206.) Dr. Choung administered a Hyalgan injection in Plaintiff's left knee. (R. 206.) Dr. Choung administered the second injection a week later. During that office visit, Plaintiff advised that he continued to experience intermittent pain in his left knee. (R. 205.) Dr. Choung administered the third and final Hyalgan injection in June 2004 in an effort to treat Plaintiff's complaints of persistent left knee pain. (R. 204.)

Later that month, Plaintiff reported for a follow up visit concerning his complaints of persistent left knee pain. Plaintiff advised that his symptoms had improved some, but he continued to have intermittent discomfort in his left knee with weight-bearing activities and ambulation. Dr. Choung discussed Plaintiff's treatment options – including arthroscopy of his knee. (R. 203.) Approximately a week later, Plaintiff returned "earlier than scheduled" pursuant to increased pain in his left knee which he advised was interfering with his daily activities. Notably, Plaintiff attributed his functional limitations solely to his knee pain. Dr. Choung scheduled Plaintiff for arthroscopy of his left knee on July 12, 2004. (R. 202.)

On July 16, 2004, Plaintiff saw Dr. Choung for a post-operative office visit complaining of pain in his left knee. Dr. Choung's examination revealed no signs of infection and minimal swelling in Plaintiff's left knee. (R. 201.) In August 2004, Plaintiff returned for a follow up visit and advised that although he continues to have mild to moderate discomfort in his left knee with weight-bearing activities, "he continue[d] to improve . . . [and] [o]verall, he [was] pleased." Examination of Plaintiff's left knee revealed minimal swelling, healed surgical sites with no signs of infection, and improved range of motion. (R. 200.)

Plaintiff missed his appointment scheduled for December 15, 2004 and was next seen by Dr. Choung in March 2005. On March 31, 2005, Plaintiff presented with complaints of persistent pain in his left knee that had recently gotten worse. Plaintiff advised that he had been experiencing swelling and episodes of his left knee giving out. Examination of Plaintiff's knee revealed effusion, severe crepitus with range of motion and tenderness to palpation. Dr. Choung gave Plaintiff an injection and provided him with a knee brace. (R. 198.) When Plaintiff returned in April 2005, he reported that the knee brace "provided him with good stability" and the injection gave him moderate relief of his left knee pain. (R. 197.)

Dr. Choung next saw Plaintiff in July 2005. During that visit, Plaintiff complained of worse pain in his left knee and increased pain in his lumbar spine. Dr. Choung's examination of Plaintiff focused on Plaintiff's knee. Dr. Choung administered an injection into Plaintiff's knee and instructed Plaintiff to do range of motion exercises. (R. 196.)

Plaintiff reported to Dr. Choung over the course of twenty-one more office visits between October 2005 and July 2007 for treatment of a variety of complaints including (in order of appearance) pain in his: left knee, lumbar spine, right shoulder, cervical spine, left shoulder, right knee, and the right upper extremity. (R. 211-34.)

At the request of Plaintiff's attorney, Dr. Choung completed a form entitled, "Residual Functional Capacity Evaluation by Treating Physician" on behalf of Plaintiff in January 2005. (R. 184-87.) Dr. Choung opined that Plaintiff was capable of sitting for up to thirty minutes at a time, and assuming Plaintiff could take a five minute break from sitting to stretch each hour during an eight hour workday, Dr. Choung found Plaintiff capable of working for a total of one hour per day, five days a week. (R. 184-85.) Similarly, Dr. Choung found Plaintiff capable of standing for up to thirty minutes at a time, and assuming Plaintiff could take a five minute break from standing to sit down or walk around each hour of an eight hour workday, Plaintiff was able to work a total of one hour per day, five days a week. Assuming Plaintiff could sit or stand at will while working, Dr. Choung opined Plaintiff was capable of working a total of one hour per day in a five day work week. (R. 185.) Dr. Choung further opined that Plaintiff could lift and/or carry up to twenty pounds. (R. 186.) When asked to provide a brief description of the clinical data and/or other medical evidence upon which his opinion was based, Dr. Choung merely noted, "[Plaintiff] has severe degenerative joint disease of the lumbar spine." (R. 186.)

On two different occasions, the Social Security Administration sought the medical opinion of non-examining state agency physicians. However, on both occasions, the

12

non-examining physicians were unable to assess Plaintiff's alleged medical conditions as of the date last insured due to insufficient and/or conflicting evidence. (R. 91, 210.) When the Social Security Administration contacted Dr. Choung for additional information concerning Plaintiff's medical condition(s) in September 2005, instead of answering the questions asked, Dr. Choung responded as follows: "Please see attached copy of residual functional capacity eval enclosed" (attaching a copy of Dr. Choung's RFC opinion from January 2005). (R. 183.)

**Plaintiff's Pain Testimony**

In September 2005, Plaintiff completed a form at the request of the Social Security Administration in which he complained of severe burning and aching pain in his lower back which radiated down his legs; numbness and tingling in his feet; pain in his right shoulder; and pain and numbness in both hands. According to Plaintiff, his pain was constant and his methadone was minimally effective in controlling it. (R. 81.) As a result of his pain, Plaintiff stated he was unable to sit for more than a few minutes without having to recline, and he could not walk up stairs due to pain in his knee. (R. 83.)

In January 2006, Plaintiff filled out an additional form at the request of the Social Security Administration in which he noted that he had been diagnosed with disc herniation at the L4-L5 level of his lumbar spine a few months prior (in November 2005). Plaintiff complained that his pain had increased over time, it restricted his movement and made it difficult for him to sit, stand and walk. (R. 84, 88.)

During the hearing on September 12, 2007, Plaintiff testified that he was unable to work due to pain and weakness in his legs, shoulder problems (bilaterally), carpal tunnel syndrome, and problems with his right ankle when he stands for prolonged periods of time. However, he further testified that his primary complaints concerned his problems with his back and shoulders. (R. 277.) According to Plaintiff, he was never without pain during the relevant time period (July 2003 through December 2004). (R. 279.)

With respect to his back, Plaintiff testified that he has had low back pain since 1988 and that it has gotten progressively worse over time. (R. 277-78.) He described the pain as "very sharp, burning, . . . [and] tightness" in his low back radiating into his legs. When asked to rate his back pain during the relevant time period on a scale of one to ten, Plaintiff testified that his low back pain was a "9" out of "10" over the course of the entire time period. (R. 278.)

Plaintiff described his left knee pain as "constant" and "aching" and he testified that he has experienced left knee pain rated an "8" out of "10" for the duration of the relevant time period. (R. 279.) Due to his left knee problems, Plaintiff testified that he had difficulty climbing stairs. (R. 281.)

Plaintiff also testified to having bilateral shoulder pain rated an "8" out of "10" during the relevant time period. Plaintiff described the pain as aching, burning pain and it felt like his muscles are tearing and he testified that his symptoms were worse on the right. (R. 280.)

As for his right ankle pain, Plaintiff testified that he only experienced this pain with prolonged standing and he rated it as a "5" out of "10" in severity. (R. 280-81.)

Plaintiff testified that during the relevant time period he was able to walk less than a block before he would experience increased pain and numbness in his left leg and foot. (R. 281.) He further testified that he was unable to sit for more than an hour at a time and then he would have to go and lay down for an hour in an effort to relieve his pain. (R. 281.) As for lifting activities, Plaintiff testified that he was capable of lifting a cup of coffee – but not much else. (R. 284.)

As for his activities of daily living during the relevant time period, Plaintiff testified that he would watch television for most of the day while sitting in a recliner chair. He also checked email. (R. 283.) Although he testified he was unable to cook or do any housework, he testified that he was able to make himself toast and care for his personal hygiene (except for putting on his shoes - for which he required assistance.) (R. 283-85.)

## IV. <u>DISCUSSION</u>

Plaintiff raises two issues in his appeal. The Plaintiff argues the ALJ committed reversible error by rejecting the opinion of Plaintiff's treating physician, Dr. Choung. Plaintiff also argues that the ALJ erred in discounting Plaintiff's credibility with respect to Plaintiff's complaints of pain.

In response, the Commissioner argues that Plaintiff failed to meet his burden of providing evidence that one or more of his medical conditions became disabling *after* July 26, 2003—his alleged onset of disability—but *prior* to December 31, 2004—the

expiration of his insured status. In order for Plaintiff to be eligible for disability insurance benefits, Plaintiff had to establish that he was disabled prior to the date he was last insured.[22]

### A. The ALJ's Decision to Discount the Opinion of Dr. Choung Is Supported by Substantial Evidence.

Plaintiff argues that the ALJ improperly rejected Dr. Choung's opinion that as a result of Plaintiff's severe degenerative joint disease of the lumbar spine Plaintiff can only lift or carry up to twenty pounds and Plaintiff is incapable of sitting and/or standing for more than thirty minutes at a time for a total of one hour during an eight hour workday. As Plaintiff's treating physician, Dr. Cheung's opinion would generally be entitled to great weight absent a showing of "good cause" to the contrary.[23] Nonetheless, a treating physician's conclusory statements are entitled to only such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[24] The ALJ has the discretion to give less weight to a treating

---

[22] 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, .130, .131; Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005).

[23] Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997) ("'[G]ood cause' . . . exist[s] where the doctor's opinion [is] not bolstered by the evidence, or where the evidence support[s] a contrary finding" and also where "the doctors' opinions [are] conclusory or inconsistent with their own medical records") (internal citations omitted); see also 20 C.F.R. § 404.1527(d) (describing the manner in which the ALJ is to evaluate medical evidence); O'Neal v. Astrue, 5:07-cv-143-Oc-10GRJ, 2008 WL 2439885, at *3 (M.D. Fla. June 13, 2008).

[24] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

physician's opinion or report regarding the claimant's capacity to work if the opinion is wholly conclusory or unsupported by objective medical evidence.[25]

Mindful of the relevant time period (July 2003 through December 2004), the ALJ gave "little weight" to Dr. Choung's assessment because the ALJ found it to be inconsistent with Dr. Choung's own treatment notes as well as the evidence of record as a whole during this relevant time frame.

Notwithstanding the fact that Dr. Choung has been Plaintiff's treating physician since 2001, and since that time has treated Plaintiff for a large variety of orthopedic problems, the sole basis offered to support his assessment of Plaintiff's residual functional capacity was Plaintiff's "severe degenerative joint disease [of the] lumbar spine." Although Dr. Choung noted Plaintiff's generalized complaints of persistent pain in multiple areas on more than one occasion during the relevant period, Plaintiff's primary complaints, and more specifically the complaints for which Plaintiff sought treatment from Dr. Choung, did not involve Plaintiff's lumbar spine. And while Dr. Choung's treatment notes during that time reflect some functional limitations related to Plaintiff's complaints of pain – none of them were related to Plaintiff's lumbar spine problems. For example, in August 2003, Dr. Choung noted that Plaintiff was having difficulty grasping objects due to pain in his right elbow and forearm. In May 2004, Dr. Choung encouraged Plaintiff to limit twisting motion pursuant to Plaintiff's complaints of pain and discomfort in his left knee. In a subsequent office visit, Dr. Choung also noted

---

[25] Edwards v. Sullivan, 937 F.2d 580, 584 (11th Cir. 1991) (ALJ had no obligation to defer to treating physician's report where physician conceded he was unsure of the accuracy of his findings).

that Plaintiff's complaints of left knee pain were associated with weight-bearing activities. Notably, the first time Dr. Choung noted any complaints of lumbar pain following Plaintiff's alleged onset of disability in July 2003 was November 2005 when Plaintiff advised that he had recently experienced worsening of his lumbar pain. (R. 233.)

Thus, there is a void between the complete absence of any specific references to complaints of lumbar pain and/or any functional limitations attributable to Plaintiff's lumbar spine condition between July 2003 and December 2004 and Dr. Choung's assessment dated January 2005 in which he imposed extreme functional limitations founded solely upon the diagnosis of degenerative joint disease of the lumbar spine.

Dr. Choung's assessment is also inconsistent with treatment notes from Plaintiff's pain management specialist, Dr. Reheem. Dr. Reheem's treatment notes reflect that between February 2003 and January 2004, Plaintiff consistently reported that his medications were controlling his pain to a tolerable level. Further, in stark contrast with Dr. Choung's opinion is Dr. Reheem's observation in August 2003 that Plaintiff was reportedly capable of exercising in the pool on a daily basis.

In sum, the Court concludes that the ALJ articulated particularized reasons for discounting Dr. Choung's January 2005 residual functional capacity assessment and those reasons are supported by substantial evidence. While there may be support for Dr. Choung's opinion for Plaintiff's condition after the date last insured there is simply very little in Dr. Choung's own treatment notes that support his opinion for the period of time before the date last insured.

**B.** **The ALJ's Decision to Discount the Credibility of Plaintiff's Complaints of Pain Is Supported by Substantial Evidence.**

Plaintiff also argues that the ALJ improperly rejected his pain testimony. In evaluating a disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[26] Where, as here, an ALJ decides not to fully credit a claimant's testimony about subjective complaints concerning the intensity, persistence and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[27] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[28]

With no appreciable development of his argument, Plaintiff suggests that the ALJ ignored "the very nature of . . . Plaintiff's L5 radiculopathy from his L4-L5 nerve root injury." Contrary to Plaintiff's argument, the ALJ expressly found Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (R. 19.) It was Plaintiff's statements concerning the intensity, persistence and limiting effects of his pain that the ALJ found to be not entirely credible. In doing so,

---

[26] 20 C.F.R. § 404.1528.

[27] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Dep't of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence); Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[28] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

the ALJ noted that Plaintiff's testimony was inconsistent with objective medical evidence of record.

Plaintiff testified that he was unable to work during the relevant time period due to pain and weakness in his legs, low back pain, shoulder problems (bilaterally), carpal tunnel syndrome, and problems with his right ankle when he would stand for prolonged periods of time. (277) According to Plaintiff, he experienced constant severe low back pain throughout the relevant time period which he rated a "9" out of "10." Plaintiff also testified that, between July 2003 and his date last insured, he experienced constant pain in his left knee and both shoulders which he rated as an "8" out of "10." He reported intermittent pain in his right ankle.

Plaintiff testified that as a consequence of his pain he was unable to lift much more than a coffee cup, was able to walk less than a block, and could sit for less than an hour at a time before he would need to go and lay down for an hour. (281) According to Plaintiff, he spent most of his day in a chair during the relevant time period.

However, there is objective medical evidence of record that contradicts Plaintiff's testimony. Specifically, despite Plaintiff's complaints of experiencing disabling knee pain throughout the relevant time period, evidence from Dr. Choung and Dr. Reheem shows that Plaintiff's left knee pain did not arise until approximately April 2004 – approximately nine months after the alleged onset of disability. Further, treatment notes from both Dr. Choung and Dr. Reheem demonstrate that Plaintiff's left knee problems improved following the July 2004 arthroscopy and his subsequent complaints of pain were intermittent.

Plaintiff also testified that he had disabling shoulder pain (bilaterally) throughout the relevant time period. Although Plaintiff does have a history of left shoulder problems pre-dating the alleged onset of disability, according to Dr. Choung's treatment notes, those problems had apparently been resolved prior to July 2003. Plaintiff did not report any shoulder complaints during the relevant time period. In addition, Plaintiff's first complaint of right shoulder pain appeared in a June 2006 treatment note from Dr. Choung – well after the expiration of Plaintiff's insured status. (R. 232.)

Plaintiff also testified that he experienced severe back pain throughout the relevant time period that was uncontrolled by his medications. This testimony is inconsistent with numerous treatment notes from Dr. Reheem from that same time period in which Plaintiff advised that his pain medications made his pain tolerable. Also, contrary to Plaintiff's testimony that his "primary" problems were his back and his shoulders, Dr. Choung's treatment notes reflect that Plaintiff's primary complaints between July 2003 and December 2004 did not involve Plaintiff's back or shoulders.

Accordingly, for these reasons, the Court concludes that the ALJ articulated specific reasons for discounting Plaintiff's credibility as to the limiting effects of Plaintiff's symptoms and the reasons for discrediting Plaintiff's credibility are supported by substantial evidence in the record.

## V.  CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 22, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel